DocuSign Envelope ID: B599671A-DA04-455C-BF20-50F235F37D83

McKESSON McKesson Corporation and its affiliated companies (collectively referred to as "**McKesson**")

# CUSTOMER APPLICATION

CD01-M V.04-16

(Please print in block letters)

Type of Business: ☐ Acute ☐ Primary Care ☐ Specialty ☐ Home Health ☐ Extended ☐ Long Term ☐ Pharmacy ☐ Closed Door ☐ Mail Order ☐ Supplier ☐ Other ________ 95701322

Are you currently a McKesson customer? If so, please provide account# ________

| | | |
|---|---|---|
| Advanced Biomedical Solutions | https://advancedbiomedicalsolutions.com/ | [redacted]8930 |
| **Legal Company Name** | Website Address | Federal Tax ID / EIN |
| 3450 Bridgeland Drive STE G | Bridgeton | MO 63044 |
| Legal Address (Main Office) | City | State Zip |
| Natori Perdue | Office Manager | 3149720100 |
| **Contact Name** we may call for questions regarding this application | Title | Phone |

| | | | |
|---|---|---|---|
| MO | Bridgeton | MO | 63044 |
| Billing / Statement Address (if different than Main Office) | City | State | Zip |
| Natori Perdue | 3149720100 | info@advancedbiomedicalsolutions.com | |
| Billing/Statement Contact Person | Billing/Statement Contact Telephone | Billing/Statement Email(s) | |

**Invoices and Statements will be emailed to Billing/Statement Email(s) unless indicated** ☐ Direct Mail

**Shipping Information:** Mail Invoices to Ship-to ☐

| | | | |
|---|---|---|---|
| ADVANCED BIOMEDICAL SOLUTIONS LLC | $ $1,000-5,000 | Taxable | |
| DBA or Business Trade Name of Account | **Estimated Monthly Purchases** | Tax Status | |
| 3450 Bridgeland Drive ste G | Bridgeton | MO | 63044 |
| Ship to Address | City | State | Zip |
| Natori Perdue | 3149720100 | | info@advancedbiomedicalsolutions.com |
| Ship to Contact Person | Ship to Telephone | Ship to Fax | Ship to Email |

DEA# ________ HIN# ________ Medical License# ________ Name on License ________ License Type ________ License State ________

**Shipping Information#2:** ☐ If more than 2 Ship-to, please attach multiple Ship-to's Information Mail Invoices to Ship-to ☐

DBA or Business Trade Name of Account ________ $ ________ **Estimated Monthly Purchases** ________ Tax Status ________

Ship to Address ________ City ________ State ________ Zip ________

Ship to Contact Person ________ Ship to Telephone ________ Ship to Fax ________ Ship to Email ________

DEA# ________ HIN# ________ Medical License# ________ Name on License ________ License Type ________ License State ________

**Ownership Type:** ☐ Proprietorship ☐ Partnership ☐ Limited Partnership ☒ Limited Liability Company ☐ Private Corp ☐ Public Corp ☐ Professional Corp ☐ Non-Profit Corp ☐ Government

2023 — **YEAR Current Ownership**; MO — **State Org**

Has applicant, applicant's parent or affiliates ever filed for bankruptcy? ☒ No ☐ Yes ________ Bankruptcy# ________ Bankruptcy Date ________ Bankruptcy Chapter ________

| | | | | |
|---|---|---|---|---|
| Buchman, Neesha | 100 | [redacted] | 3450 Bridgeland Drive | 63044 |
| **Principal Owner or Stockholder** | **% Ownership** | **Social Security Number** | **Home Address** | **Zip** |
| | | **Last 4 Digits Only** | | |
| **Principal Owner or Stockholder** | **% Ownership** | **Social Security Number** | **Home Address** | **Zip** |

**NAME OF CONTROLLING ENTITY** (if any) ________ Applicant's relationship to controlling entity ________ Phone ________

Address of Controlling Entity ________ City ________ State ________ Zip ________

**REFERENCES:**

Primary Bank/Financial Institution ________ Account Number ________ Contact Name ________ Phone ________

Primary Supply Provider ________ Account Number ________ Contact Name ________ Phone ________

Secondary Supply Provider ________ Account Number ________ Contact Name ________ Phone ________

**This section applies to all accounts with MCKESSON CORPORATION and its affiliated companies ("McKesson")**

Customer agrees to abide by (I) standard terms of sale provided or made available by McKesson and/or shown on McKesson's invoices or statements and (II) any written agreement or terms of sale with McKesson governing Customer's account. Customer agrees to pay for all purchases, fees and other charges incurred by Customer or an authorized user on any account of Customer, including service charges on past due amounts at the highest rate permitted by law (including purchases shipped and/or billed to a third-party agent on behalf of Customer). Any payment made after the net due date shall result in the loss of any prompt cash payment discount specified on the related invoice or statement and Customer shall pay the gross amount plus any applicable service charges. Without limiting McKesson's other legal rights, McKesson may exercise a right of set-off against amounts due Customer from McKesson Corporation or any of its affiliates. McKesson reserves the right, in its sole discretion, to change a payment term (including imposing cash payment upon delivery), to limit total credit and/or to suspend or discontinue the shipment of any orders to Customer if McKesson concludes that (I) there has been a material adverse change in the Customer's financial condition or payment performance or (II) Customer has ceased or is likely to cease to meet McKesson's credit requirements.

Customer represents that it is entitled to discounted prices from manufacturers as it has notified McKesson ("**Contract Prices**"). In consideration of McKesson allowing Customer to purchase products at Contract Prices, Customer represents that McKesson will be paid by the appropriate manufacturer the difference between McKesson's acquisition price and the Contract Price ("**Chargeback**") and Customer will be liable to McKesson for any unpaid Chargeback if any manufacturer (I) denies a Chargeback for any reason, (II) makes an assignment for the benefit of creditors, files a petition in bankruptcy, is adjudicated insolvent or bankrupt, or if a receiver or trustee is appointed with respect to a substantial part of its property or a proceeding is begun which will substantially impair its ability to pay Chargebacks or (III) fails to pay McKesson Chargebacks for any reason other than McKesson's gross negligence.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating due to race, color, religion, national origin, sex, marital status, age; or because all or part of the Customer's income is from any public assistance program; or the Customer, in good faith, exercises any right under the Consumer Credit Protection Act. The Federal Trade Commission, Equal Credit Opportunity, Washington, DC 20580 administers compliance with this law. Customer represents and warrants that Customer has read and understands this form and has reviewed the information provided in its entirety, including responses completed for Customer by a McKesson representative, and that all information is complete and correct. Customer agrees that McKesson will be relying on such information and will notify McKesson of any material changes to such information.

Customer agrees to provide McKesson with financial statements upon request. Customer authorizes McKesson, its employees, representatives, and agents to (I) investigate information provided and Customer's credit, financial and banking records, (II) obtain Customer's credit bureau report and (III) share with its affiliates experiential and transactional information regarding Customer and Customer's account. McKesson is authorized to retain information obtained as part of the application process whether or not the requested account and/or credit is granted. Customer agrees to pay all reasonable attorney fees and expenses or cost incurred by McKesson in enforcing its rights to collect amounts due from Customer. This form and any account opened in favor of Customer are subject to credit approval by McKesson.

By signing below, the undersigned authorized McKesson to order a consumer report related to the business principal(s) to determine credit eligibility.

| | | | |
|---|---|---|---|
| DocuSigned by: Natori Perdue E575EB0C6B1B4B3... | Natori Perdue | OFFICE Manager | 4/23/2024 |
| Authorized Signature | Print Name | Title | Date |

*(By signing, I represent that I have sufficient authority to execute this application on behalf of the applicant and bind the applicant to the terms hereof)*

McKESSON Companies (collectively referred to as "McKesson")

**TERMS AND CONDITIONS**

(Please print in block letters) CD03-M V.04-16

Legal Company Name: Advanced Biomedical Solutions Customer DBA Name: ADVANCED BIOMEDICAL SOLUTIONS LLC

Address: 3450 Bridgeland Drive STE G City: Bridgeton State: MO Zip: 63044

**CUSTOMER SET UP & AUTHORIZATION FOR AUTOMATED CLEARING HOUSE ("ACH") CREDITS AND DEBITS (electronic payment)**

Bank Name: Chase Bank Transit ABA#: [redacted]

Bank Adress: 8636 Olive Blvd Bank Account #: [redacted]

City: St. Louis State: MO Zip: 63128 Bank Phone Number: (314) 463-2954

Authorized Contact Name: Natori Perdue Phone: 3149720100 Fax: Email: info@advancedbiomedicalsolutions.com

Alternate Contact Name: Natori Perdue Phone: 3149720100 Fax: Email: info@advancedbiomedicalsolutions.com

**ACH Preference:** ☐ Manual – Please call the phone number on your invoice or statement when you are ready to make a payment
☐ Daily – Invoices will be processed daily
☒ Monthly – All invoices listed on your statement will be processed on the first business day following your statement date
☐ Weekly – Previous weeks invoices will be processed every Monday

Customer authorizes McKesson Corporation, A Delaware Corporation, for itself and as collection agent for any of its affiliates (collectively "**McKesson**"), to initiate ACH credit and debit entries to/from Customer's business account indicated above for amounts owed on invoices or statements that are provided to Customer and Customer hereby authorizes the financial institution named above (the "**Institution**"), to accept the ACH credit and debit entries. Authority to initiate ACH credit and debit entries shall remain in full force and effect until McKesson's Credit Department has received written notice from Customer 30 days in advance of its termination of such authorization. Customer understands that Customer has the legal right to stop payment of an ACH credit or debit entry by notification to Institution; provided, prior to such action, Customer shall give McKesson 30 days written notice to permit McKesson to take any necessary actions to avoid disruptions in payments from Customer. Customer agrees to follow NACHA rules applicable to ACH transactions.

Customer agrees to pay for all purchases, services, fees and other charges incurred by Customer, any employee or other agent (whether acting under authority of the Customer or otherwise) on any account of Customer, including service charges on past due amounts at the highest rate permitted by law (including purchases shipped and/or billed or services provided to a third-party agent on behalf of Customer). Customer agrees to pay all reasonable attorney fees and expenses or costs incurred by McKesson in enforcing its rights to collect amounts due from Customer. Without limiting McKesson's other legal rights, McKesson may exercise a right of set-off against amounts due Customer from McKesson. McKesson reserves the right, in its sole discretion, to change a payment term (including imposing cash payment upon delivery), to limit total credit and/or to suspend or discontinue the shipment of any orders or the providing of any service, software, support or implementations to Customer if McKesson concludes that (I) there has been a material change in the Customer's financial condition or payment performance or (II) Customer has ceased or is likely to cease to meet McKesson's credit requirements.

DocuSigned by: Natori Perdue E575EB9C6B1B4B3... | Natori Perdue | OFFICE Manager | 4/23/2024

**AUTHORIZED SIGNATURE** | Print Name | Title | Date

*(By signing, I represent that I have sufficient authority to execute this application on behalf of the applicant and bind the applicant to the terms hereof)*

**Standard payment terms (subject to credit approval by McKesson):**

**30 Day Invoice Payment Terms**: Invoices are due and payable on or before the 30th day after the invoice date.

**Security Interest**: In order to secure timely and full payment and performance of all present and future obligations of Customer to McKesson Corporation and any of its affiliates (collectively referred to as "**McKesson**") (all collectively referred to as the "**Obligations**"), including, without limitation, all promissory notes, direct loans or sales on credit, Customer hereby grants to McKesson Corporation, for the benefit of McKesson, a security interest in all of Customer's right, title and interest in and to its personal property, whether now owned or hereafter acquired, including, without limitation, all Accounts, Cash, Chattel Paper, Deposit Accounts, Documents, Equipment, General Intangibles, Goods, Health Care Insurance Receivables, Instruments, Inventory, Investment Property, Letter-of-Credit Rights and promissory notes, together with all attachments, replacements, substitutions, additions and accessions, and all Proceeds and products thereof and all books and records relating to any of the foregoing (collectively, the "**Collateral**"). Capitalized terms used herein that constitute Collateral shall have the meanings given to such terms under the California Uniform Commercial Code. All items of Collateral shall remain personal property and not become part of any real estate regardless of the manner of affixation. The security interest granted hereby shall be deemed to constitute a purchase money security interest in any and all Collateral (including, without limitation, all Goods, Inventory and Equipment) purchased by Customer either directly from McKesson (thereby securing payment of the purchase price) or from a third party using proceeds of loans or advances made by McKesson (thereby securing repayment of such loans or advances). Customer authorizes McKesson to send notices to any other persons claiming a security interest in any of the Collateral. **By its signature below, Customer acknowledges that McKesson Corporation shall file a UCC-1 financing statement with the applicable state agency in order to perfect the security interest granted hereby.**

DocuSigned by: Natori Perdue E575EB9C6B1B4B3... | Natori Perdue | OFFICE Manager | 4/23/2024

**AUTHORIZED SIGNATURE** | Print Name | Title | Date

*(By signing, I represent that I have sufficient authority to execute this application on behalf of the applicant and bind the applicant to the terms hereof)*

**Guaranty**: The undersigned (individually or collectively, the "**Guarantor**") hereby jointly and severally guarantees to McKesson Corporation and its affiliates (collectively referred to as "**McKesson**") that Customer will fully and promptly perform and pay all its present and future obligations to McKesson, whether direct or indirect, joint or several, absolute or contingent, secured or unsecured, matured or unmatured, and whether originally contracted with McKesson or otherwise acquired by McKesson. This guaranty applies to all of Customer's obligations to McKesson, even if such obligations are invalid or unenforceable against Customer for any reason and even if any security for such obligations is insufficient, invalid, unenforceable or not perfected. This guaranty is an absolute and unconditional guaranty of payment. It is a continuing guaranty and covers any future extensions of credit by McKesson to Customer. This guaranty is a guaranty of payment when due and not merely of collectability after judgment or other action against Customer.

McKesson may at any time, without Guarantor's consent, without notice to Guarantor and without affecting or impairing Guarantor's obligations under this guaranty, do any of the following: (I) renew, modify (including any increase or decrease in the rate of interest), or extend any obligations of Customer, of co-guarantors (whether hereunder or under a separate agreement) or of any other party at any time directly or contingently liable for the payment of any of Customer's obligations; (II) enter into additional extensions of credit to Customer; (III) accept partial payments of Customer's obligations; (IV) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate any of Customer's obligations and the security therefore in any manner; (V) consent to the transfer of security; or (VI) bid and purchase at any sale of security. Guarantor agrees, without McKesson first having to proceed against Customer or any security held by McKesson, to pay on demand (I) all sums due and to become due to McKesson from Customer and (II) all losses, costs, attorney's fees or expenses which may be suffered by McKesson by reason of Customer's default on its obligations or Guarantor's default under this guaranty. Guarantor agrees to pay on demand any deficiency resulting from a sale of security held by McKesson even if the sale is made without notice to Guarantor. Guarantor's obligations under this guaranty are independent of and separate from the obligations of Customer. Upon the occurrence and during the continuance of any default by Customer, McKesson can sue any Guarantor separately from Customer, whether or not McKesson sues Customer in such lawsuit and whether or not McKesson sues Customer in a separate lawsuit. If McKesson elects to proceed with any course of action under this guaranty or against Customer, that election shall not preclude McKesson from taking any other course of action. This guaranty shall not be affected by any termination or change in the relationship between Guarantor and Customer. Guarantor assumes all responsibility for keeping informed of (I) Customer's financial condition and assets, (II) all other circumstances bearing upon the risk of nonpayment of Customer's obligations to McKesson and (III) the nature, scope and extent of the risks which Guarantor assumes and incurs under this guaranty. Guarantor agrees that McKesson shall have no duty to advise Guarantor of information known to McKesson regarding such circumstances or risks. Guarantor waives (I) notice of McKesson's acceptance of this guaranty, (II) presentment, demand, protest and notice of non-payment or protest as to any note or obligation signed, accepted, endorsed or assigned to McKesson by Customer, (III) any other demands and notices required by law and (IV) all set-offs and counterclaims.

Name (Guarantor 1): Natori Perdue Home Address: 3450 Bridgeland Drive ste g City: Bridgeton State: MO Zip: 63044

Guarantor 1 Signature: DocuSigned by: Natori Perdue E575EB9C6B1B4B3... Date: 4/23/2024 SSN#: [redacted]

*(This section must be signed by an owner/principal)*

Name (Guarantor 2): Natori Perdue Home Address: City: State: Zip:

Guarantor 2 Signature: Date: 4/23/2024 SSN#: **Last 4 Digits Only**

*(This section must be signed by an owner/principal)*

These terms of sale ("**Terms of Sale**") apply to all product and/or service ("**Product**") purchases made by you (**"Customer"**). The term "**Customer**" as used herein shall mean any entity purchasing products from Seller, including but not limited to, any Customer Facilities or locations. Customer agrees to pay for all purchases of Products, fees, and other charges incurred by Customer or any authorized agent on behalf of Customer, including purchases shipped and/or billed to a third-party agent on behalf of Customer. Customer agrees that Products purchased from Seller are solely for use in Customer's operations. All other sales of the Products, including online, require Seller's prior written consent. Customer cannot modify these Terms of Sale without our (McKesson Medical-Surgical Inc., herein **"Seller"**) written consent and these Terms of Sale supersede the terms and conditions on any purchase order or other business form. Prior courses of dealing between us will have no effect on these Terms of Sale and would be inadmissible to explain, modify, or contradict these Terms of Sale. The term "**Facility**" means any facility with respect to which Customer exercises control over the selection of wholesale medical-surgical distributors, whether by ownership, contract or otherwise. The term "**Supplier**" as used in these Terms of Sale means a manufacturer, vendor, or other supplier of a Product that is purchased by Seller for distribution. "**McKesson Brand Products**" are products that are distributed by Seller that are labeled with Seller's owned or licensed proprietary label. If you are interested in reselling Products (whether brick-and-mortar and/or online), you must first receive Seller's prior written consent; reach out to your account representative for more information.

**1. Invoice, Payment, and Finance**

1.1. Standard Credit and Payment Terms. All invoiced amounts are due within thirty (30) days of the date of the invoice, unless stated otherwise on the invoice. If any of the specified payment term due dates fall on a weekend day or holiday, payment is due and payable on the preceding business day. Any invoiced amount remaining unpaid after the due date will be "**Past Due**." Past Due balances are subject to service or finance charges at the highest rate permitted by law, or one and one-half percent (1.5%) per month, whichever is higher. Any interest charged and collected in excess of applicable state law will be returned. Any payment made after the due date shall result in the loss of any prompt cash payment discount specified on the related invoice or statement and Customer shall pay the gross amount plus any applicable service or finance charges. If Customer fails to pay any or all of the invoiced amount when due or if Customer's credit or financial status erodes or otherwise renders Seller insecure, Seller may, in its sole discretion: (i) immediately suspend Seller's performance or cancel all or any part of an order hereunder; (ii) change any payment term to a payment term determined by Seller (including imposing the requirement of cash payment upon delivery); (iii) pay any incentives, rebates, fees, or other discount arrangements net of (a) any amounts due hereunder from Customer; or (b) unauthorized deductions and service charges; (iv) terminate and/or declare Customer ineligible for any incentives, rebates, fees, or other discount arrangements; (v) declare immediately due and payable all other amounts invoiced by Seller to Customer regardless of when such payments would otherwise be due from Customer; and/or (vi) increase the prices for Products and/or services. A credit program, if any, offered by Seller is intended for commercial purposes only and not as a 'consumer' credit program used primarily for personal, family or household purposes.

1.2. Customer agrees to render payment in full to Seller on the applicable due date without making any deductions or adjustments to such payment obligation or seeking to condition such remittance on any demand for or receipt of proofs of delivery.

1.3. In the event Customer files or is involved in any bankruptcy, insolvency, or similar case or proceeding, Seller shall apply any amounts owed by Seller to Customer, first to any pre-bankruptcy, non 11 U.S.C. § 503(b)(9) claims, and then to the 11 U.S.C. § 503(b)(9) claims.

1.4. Seller may set off any amount owing at any time from Customer (and with respect to any Customer account) to Seller (including its subsidiaries and affiliates) against any amount payable at any time by Seller to Customer, whether arising under these Terms of Sale or otherwise.

1.5. Any account opened in favor of Customer is subject to credit approval by Seller.

1.6. Customer agrees to provide Seller with financial statements upon request. Customer authorizes Seller, its employees, representatives, and agents to (i) investigate information provided and Customer's credit, financial, and banking records, (ii) obtain Customer's credit bureau report, (iii) conduct a background check and screen Customer against the Department of Health and Human Services Office of Inspector General's List of Excluded Individuals/Entities and the General Services Administration List of Parties Excluded from the Federal Procurement and Non-Procurement Programs, and (iv) share experiential and transactional information regarding Customer and Customer's account with its affiliates, credit reporting agencies, and manufacturers of certain pharmaceutical products (if such products are purchased by Customer through Seller). Seller is authorized to retain information obtained as part of the application process whether or not the requested account and/or credit is granted. Customer hereby unconditionally guarantees the performance of all obligations of any of its facilities under these Terms of Sale, including the prompt payment of the purchase price and any applicable service or finance charges and other charges for all Products shipped to the facilities, and agrees to pay any outstanding past due amounts to Seller immediately upon demand by Seller.



COPYRIGHT © 2025 MCKESSON MEDICAL-SURGICAL INC. ALL RIGHTS RESERVED.
THIS DOCUMENT IS PROPRIETARY AND YOU MAY NOT REVEAL THE CONTENTS.

1.7. Customer agrees to pay all reasonable attorney fees and expenses or costs incurred by Seller in enforcing its rights to collect amounts due from Customer.

1.8. Taxes. All amounts payable under these Terms of Sale are exclusive of sales, use, value-added, gross receipts, and other transaction taxes ("**Transaction Taxes**"). Customer will promptly pay and indemnify Seller against all such Transaction Taxes legally imposed upon and payable by Customer, unless Customer provides Seller satisfactory evidence of a valid tax exemption within applicable statutory requirements. Seller shall be fully responsible for and not entitled to any reimbursement for any taxes imposed upon Seller's net income, unemployment insurance, social insurance, or pensions, maintained pursuant to any laws, ordinances, codes or regulations.

1.9. Federal Equal Credit Opportunity Act. The Federal Equal Credit Opportunity Act prohibits creditors from discriminating due to race, color, religion, national origin, sex, marital status, age; or because all or part of the Customer's income is from any public assistance program; or the Customer, in good faith, exercises any right under the Consumer Credit Protection Act. The Federal Trade Commission, Equal Credit Opportunity, Washington, DC 20580 administers compliance with this law. Customer represents and warrants that all Customer information included on its invoice is complete and correct. Customer agrees that Seller will be relying on such information and will notify Seller of any material changes to such information.

**2. Discrepancies**. Seller will have no obligation to resolve and Customer will hold Seller harmless and waive any rights to any discrepancy or to issue any credit or refund, or to replace any goods if such claim is not made within the applicable period below. All requests for proof of delivery must be made within sixty (60) days of Seller's invoice date.

2.1. Shipment Discrepancies. Any discrepancy between any order placed by Customer and Seller's corresponding shipment(s) must be reported to Seller for resolution within thirty (30) days of Seller's invoice date.

2.2. Price or Payment Discrepancies. Any price or payment discrepancies or any claims for reimbursement must be reported to Seller for resolution before the applicable invoice is due.

**3. Non-Disposable Products**. Non-disposable Products, such as furniture and equipment, sold by Seller may be refurbished or reconditioned.

**4. Freight Charges**. Shipping and handling charges, if any, for standard deliveries will be mutually agreed upon by separate agreement or by disclosure on the invoice. Shipping and handling charges may be added to the shipping invoice for deliveries outside the contiguous forty-eight (48) states, additional deliveries, emergency orders, rush orders, orders for Products not regularly stocked by Seller's local servicing distribution center, cold chain orders, hazmat orders, bulk freight, and Products drop shipped from the Supplier. For orders less than Seller's minimum order requirement, Seller may add to the invoice a handling charge determined by Seller and disclosed to Customer prior to or at the time of order. A fuel surcharge, if applicable, may be added to the invoice. Detailed information on the fuel surcharge can be obtained by request. Seller has the right to ship Products at all times via its own vehicle or a carrier selected by Seller. For delivery directly to an end-user's place of residence made at the direction of Customer ("**Patient Home Delivery**"), in addition to Patient Home Delivery shipping and handling fees, Seller may charge Customer additional surcharges, including, but not limited to, signature fees, address or billing information correction fees, delivery area surcharges, and other accessorial fees.

**5. Title and Risk of Loss**. For delivery without any patient/consumer designation or segregation (e.g., bulk delivery), title and risk of loss for the Products will pass to Customer at the time the Products reach their designated destination, except that drop shipments directly from a Supplier will be shipped in accordance with the Supplier's shipping policies. For Patient Home Delivery, ownership of the Products will transfer to Customer at the time Customer places the Product order with Seller but risk of loss will remain with Seller until the Products reach their designated destination.

**6. Third-Party Logistics Provider Services**. If Seller is providing third-party logistics provider services to Customer or otherwise providing direct patient/consumer shipment services for Customer, Customer represents and warrants that (i) it has all required permits, licenses and prescriptions/physician orders necessary to dispense or administer Products to its patients, including, without limitation, all required licenses to dispense or administer the Products into the states in which Customer dispenses, administers or sells Products and (ii) it has verified that all recipients of the Products are appropriately registered or otherwise authorized to receive delivery of the Products. Customer is solely responsible for confirming that the Products ordered are appropriate and medically necessary for its patients and in compliance with the required prescriptions or physician orders.

**7. Return and Refund Policy**. Subject to applicable law, Seller will process returns and refunds in accordance with its Return and Refund Policy currently in effect, or as otherwise agreed to by Seller and Customer. Seller's current Return and Refund Policy is as follows:

- All requests for credits for Products must have a return authorization number issued by Seller's customer service department or Seller's automated customer service platform (e.g., McKesson SupplyManager℠). Products NOT stocked in any of Seller's distribution centers that are greater than $100 will also require return authorization from the applicable vendor of the product.
- Seller will issue a full credit for any Product returned due to Seller error (i.e., shipping error, damage in transit) or due to a recall or defective condition.
- The following Products are not eligible for a credit, unless the return is due to Seller error, recall, or defective condition: (i) special order Products; (ii) custom Products; (iii) Products identified as non-returnable in McKesson SupplyManager; (iv) Products not available for general or unrestricted distribution; (v) refrigerated or frozen (cold chain) Products other than


COPYRIGHT © 2025 MCKESSON MEDICAL-SURGICAL INC. ALL RIGHTS RESERVED.
THIS DOCUMENT IS PROPRIETARY AND YOU MAY NOT REVEAL THE CONTENTS.

certain flu or core vaccines; and (vi) nonsalable Products. Nonsalable Products include, but are not limited to, Products that are open, damaged, below minimum acceptable product dating set by Seller (available at mms.mckesson.com on the product detail page), hazmat, controlled pharmaceuticals, discontinued by the manufacturer, or that contain markings not made by Seller.

- Seller will issue a credit as follows for McKesson Brand Products purchased directly from Seller: if return is requested within one (1) year of invoice date - Full credit; if return is requested after one (1) year - No credit. Non-consumable McKesson Brand Products must be sent back to Seller's distribution center to be eligible for a credit and are subject to inspection by Seller before credit is issued to Customer. Consumable McKesson Brand Products should not be sent back to Seller's distribution center. If a McKesson Brand Product is not purchased directly from Seller, no return for credit will be honored.
- Seller will issue a credit as follows for all other eligible Products:
  - Products stocked in Seller's distribution center that are less than $25: if return is requested within 90 days of invoice date credit - Full Credit; if return is requested after 90 days - No Credit. Such Products are not required to be sent back to Seller to be eligible for a credit.
  - Products stocked in Seller's distribution center that are $25 and greater: if returned within 30 days of invoice date - Full credit; if returned between 30-90 days - Full credit, less a restocking fee per Product of 20% of the sell price; if returned after 90 days - No Credit. Such Products must be sent back to Seller to be eligible for a credit and are subject to inspection by Seller before credit is issued to Customer.
  - Products NOT stocked in any of Seller's distribution centers that are less than $100 - No Credit
  - Products NOT stocked in any of Seller's distribution centers that are $100 - $500: if returned within 90 days of invoice date - Full credit, less Seller and vendor restocking fees per Product; if returned after 90 days - No Credit.
- Products NOT stocked in any of Seller's distribution centers that are greater than $500 requires additional approval by Seller. Such Products must be sent back to Seller to be eligible for a credit and are subject to inspection by Seller before credit is issued to Customer.

**8. <u>Direct to Patient Communication</u>**. Seller represents and warrants that it will use its best efforts to ensure that email communications regarding order status sent to Customer's patients are accurate and timely. Customer agrees to the following:

8.1. Customer hereby consents to Seller sending email communications regarding order status directly to Customer's patients.

8.2. Customer represents and warrants that it will obtain all necessary consents from its patients to allow Seller to send such email communications.

8.3. Customer represents and warrants that it will comply with all applicable federal and state laws, including but not limited to any opt-out requirements, regarding the collection and use of patient email addresses for the purpose of receiving order status communications.

8.4. Customer shall indemnify, defend, and hold harmless Seller, its officers, directors, employees, agents, and affiliates from and against any and all claims, liabilities, damages, losses, costs, and expenses (including reasonable attorneys' fees) arising out of or related to any claims made by Customer's patients concerning the email communications sent by Seller, including but not limited to claims regarding the lack of patient consent or non-compliance with federal and state laws.

**9. <u>AED Devices</u>**. Customer acknowledges that Customer may purchase automated external defibrillator ("**AED**") devices from Seller; however, AED compliance and/or training programs, if any, will only be offered and performed by a third party, not Seller.

**10. <u>Security Interest</u>**. Customer hereby grants to McKesson Corporation, a Delaware corporation, for itself and as collateral agent for each of its affiliates, including but not limited to, McKesson Medical-Surgical Inc. and McKesson Medical-Surgical Minnesota Supply Inc. ("**McKesson**"), a security interest in and lien on all of Customer's right, title, and interest in and to any inventory and/or equipment purchased from Seller and all products and proceeds thereof, as security for Customer's payment obligations hereunder. Customer hereby authorizes McKesson to file any UCC financing statement or amendment that McKesson considers necessary to perfect or protect such security interest. If Customer defaults under these Terms of Sale or under any payment obligations to McKesson and its affiliates, Seller has all rights and remedies under applicable law for enforcement of its security interest, which may include the right to self-help repossession of such equipment.

**11. <u>Chargebacks</u>**. In consideration of Seller allowing Customer to purchase Products at discounted prices, Customer agrees that Seller will be paid the difference between Seller's acquisition cost and the discounted cost of the Product from the applicable Supplier ("**Chargeback(s)**"). In the event Seller is denied any Chargeback from a Supplier as a result of Customer providing incomplete, inaccurate, or incorrect information to Seller or Supplier, Customer will be liable to Seller for such Chargeback amount. In the event Supplier: (i) makes an assignment for the benefit of creditors, files a petition in bankruptcy, is adjudicated insolvent or bankrupt, or if a receiver or trustee is appointed with respect to a substantial part of Supplier's property or a proceeding is commenced against it which will substantially impair its ability to pay on Chargebacks; or (ii) otherwise defaults in the payment of Chargebacks to Seller, Customer will be invoiced and become liable for the unpaid Chargebacks allocable to its purchases from Supplier.

**12. <u>Force Majeure</u>**. Except for the obligation to pay money, a party will not be liable to the other party for any failure or delay caused by a Force Majeure Event, whether or not such matters were foreseeable, and such failure or delay will not constitute a material breach of these Terms of Sale. "**Force Majeure Event**" means any cause beyond the reasonable control of a party including but not limited to natural disasters or acts of God; destruction of production facilities; acts of war; terrorism; riots; embargoes; acts


COPYRIGHT © 2025 MCKESSON MEDICAL-SURGICAL INC. ALL RIGHTS RESERVED.
THIS DOCUMENT IS PROPRIETARY AND YOU MAY NOT REVEAL THE CONTENTS.

of civil or military authorities; voluntary or involuntary compliance with any regulation, law or order of any government; labor disputes or stoppages; denial of or delays in processing of export license applications; transportation delays; epidemics, pandemics or outbreak of communicable disease; quarantines; national or regional emergencies; unavailability of materials, energy or machinery; or internet system encountering hacker's invasion. Furthermore, Seller is not a manufacturer of items and therefore is not able to prevent and is not liable for industry-standard supply chain issues such as manufacturer backorders, discontinuations, or allocations due to high demand or short supply.

**13. Product Recommendations**. Seller may make available to Customer certain recommendations concerning products that are comparable, functionally equivalent, clinically equivalent, or equivalent to other products used or identified by Customer ("**Equivalency Recommendations**").

Customer agrees and stipulates that, in making any Equivalency Recommendation, Seller is relying solely on the independent skill, knowledge, and judgment of its Suppliers or others in the industry and is not independently providing medical product information upon which Customer can rely in order to make its product selection decision. Customer agrees and stipulates that in making product decisions, Customer is relying on its independent professional judgment. Customer hereby agrees to waive, release, indemnify and hold Seller and its affiliates harmless from any claim arising from an Equivalency Recommendation. Customer agrees and stipulates that it is a sophisticated user of medical products and it agrees and stipulates that it is a learned intermediary between Seller and the end user consumer.

THESE EQUIVALENCY RECOMMENDATIONS MAY BE MADE VERBALLY, IN WRITING OR VIA A DATABASE. THE EQUIVALENCY RECOMMENDATIONS ARE RECOMMENDATIONS ONLY AND ARE NOT REPRESENTATIONS OR WARRANTIES CONCERNING ANY PRODUCT PERFORMANCE OR EQUIVALENCY AND ANY SUCH REPRESENTATIONS OF WARRANTY ARE HEREBY DISCLAIMED. THESE EQUIVALENCY RECOMMENDATIONS ARE BASED UPON MATERIALS SUPPLIED BY SELLER'S SUPPLIER AND OTHER INDUSTRY–AVAILABLE INFORMATION.

The Switch & Save program is an automated tool that shows Customer's savings available by switching from products in Customer's current purchasing history to alternative products from the Customer's current purchasing history. Alternative products are not necessarily the lowest priced items available.

**14. DISCLAIMER**. SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AS TO THE MERCHANTABILITY OF ANY PRODUCTS OR THEIR FITNESS FOR ANY PARTICULAR USE OR PURPOSE. CUSTOMER WILL LOOK TO THE MANUFACTURER OF PRODUCTS AND THE PROVIDER OF SERVICES (IF OTHER THAN SELLER) FOR ANY WARRANTY THEREON. NO AGENT, EMPLOYEE, OR REPRESENTATIVE OF SELLER HAS ANY AUTHORITY TO MAKE ANY AFFIRMATION, REPRESENTATION, OR WARRANTY CONCERNING PRODUCTS NOT SET FORTH IN THESE TERMS OF SALE.

CUSTOMER SHALL NOT HOLD SELLER LIABLE FOR ANY DEFECT IN PRODUCTS OR DEFECT IN SERVICES NOT PROVIDED BY SELLER, REGARDLESS OF KIND. CUSTOMER AGREES TO FILE SOLELY WITH THE MANUFACTURER OF THE PRODUCTS OR PROVIDER OF SERVICES (IF OTHER THAN SELLER) ANY CLAIM OR LAWSUIT ALLEGING LOSS, INJURY, DAMAGE, OR DEATH ARISING OUT OF OR CAUSED BY THE USE, SALE, DISTRIBUTION, OR POSSESSION OF PRODUCTS OR SERVICES.

**15. LIMITATION OF LIABILITY**. IN NO EVENT WILL SELLER BE LIABLE IN CONNECTION WITH, OR RELATED TO THESE TERMS OF SALE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE, OR CONSEQUENTIAL DAMAGES, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE, (INCLUDING LOST PROFITS) FROM ANY CAUSE, INCLUDING, WITHOUT LIMITATION, DAMAGES RESULTING FROM ANY UNAVAILABILITY OF, DEFECT IN, OR MISSHIPMENT OF PRODUCTS OR THE PROVISION OF SERVICES, AND WHETHER OR NOT SELLER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

**16. Government Contracts**. Unless specifically notified and agreed to in writing by Seller, Customer is expressly prohibited from either directly or indirectly marketing or reselling Products, including, but not limited to (i) the United States federal government; or (ii) any United States state and local government agencies, public education institutions, and state and local government healthcare entities; or (iii) any entities that the Customer knows or reasonably should know will market or resell to United States federal, state, or local government agencies. Seller will not be bound by the terms and conditions of any government contracts to which Customer may be a party.

**17. No Violations**. Customer represents and warrants that its execution, delivery and performance of these Terms of Sale does not and will not constitute (i) a violation of any judgment, order, or decree binding on such party; (ii) a breach under any contract by which such party is bound; (iii) an event that would, with notice or lapse of time, or both, constitute such a breach or (iv) require any consent under any agreement between Customer and any other party. Customer will defend, indemnify and hold harmless Seller from and against any and all losses arising out of or resulting from its breach of any representation or warranty in this section.

**18. Customer-Specific Inventory**. In the event (i) Customer or Seller ceases to do business with the other, regardless of the reason; or (ii) Customer's orders for Customer-Specific Inventory decreases below its previous six-month average without at least sixty (60) days notice from Customer and such decrease persists for at least ninety (90) days, Seller reserves the right to ship any and all Customer-Specific Inventory that is in transit to Customer or held in inventory by Seller for Customer, in amounts not to exceed ninety (90) days of inventory based on Customer's historical purchases of the applicable Products, and either invoice Customer at the Customer Price (plus any shipping and handling costs) or debit Customer's account for such amount, at Seller's option, or a combination of both. "**Customer-Specific Inventory**" means certain Products identified by Seller to be "custom products" or "special order items" with no ready market other than Customer, regardless of whether any of the Products could be classified for any other reasons or circumstances as standard usage products with a readily available market.


COPYRIGHT © 2025 MCKESSON MEDICAL-SURGICAL INC. ALL RIGHTS RESERVED.
THIS DOCUMENT IS PROPRIETARY AND YOU MAY NOT REVEAL THE CONTENTS.

In the event Customer fails to timely purchase such Customer-Specific Inventory as described above, Seller may, but is not required to, dispose of such Customer-Specific Inventory in a manner of its choosing and invoice Customer or debit Customer's account for the Product plus any and all fees or costs incurred for such disposal.

**19. <u>Confidential Information</u>**. The parties and their employees or representatives (collectively, the "**Receiving Party**") agree that the existence of these Terms of Sale and all proprietary and confidential information ("**Confidential Information**") disclosed by the other ("**Disclosing Party**") will be maintained in confidence and not disclosed to any third party except as may be required by law, or with the Disclosing Party's express written consent. Pricing and terms of these Terms of Sale are the Confidential Information of Seller. Confidential Information does not include information that (i) is now in the public domain or subsequently enters the public domain through no fault of the Receiving Party; (ii) the Receiving Party can establish is presently known or becomes known to the Receiving Party from its own independent sources; (iii) is received from any third party not under any obligation to keep such information confidential; or (iv) the Receiving Party can establish was not Confidential Information disclosed by the other party under these Terms of Sale. Violation of this provision may give rise to equitable and legal liability including, but not limited to, injunctive relief.

**20. <u>Data Rights</u>**. Seller may use, repurpose, copy, modify, distribute, display and/or publish transactional data for Seller's own use and for commercial purposes. Customer acknowledges that Seller may provide information and reports to group purchasing organizations, Suppliers, and other third parties relating to Customer's purchases from Seller. Customer hereby waives any rights of confidentiality with respect to such information to the extent necessary to allow Seller to provide such information to group purchasing organizations, Suppliers, and other third parties.

**21. <u>Intellectual Property</u>**. Customer acknowledges that Seller is the exclusive owner of its trademarks, logos, trade dress, designs, and copyrights ("**Intellectual Property**"). Customer cannot claim any ownership of Seller Intellectual Property and cannot distribute Seller Intellectual Property to other parties without the express written permission of Seller.

**22. <u>Publicity and Use of Name</u>**. Customer will not make any public announcement or press release regarding Seller or any activities performed by Seller without the prior written consent of Seller.

**23. <u>Compliance</u>**.

23.1. General. Customer represents and warrants that it will fully comply with all federal, state and local laws and regulations relating to its obligations under these Terms of Sale or otherwise applicable to the purchase, handling, sale, distribution or dispensing of and the reimbursement for the Products and represents and warrants that: (i) pharmaceutical Products are being purchased for dispensing or administration to patients pursuant to a legitimate prescription; and (ii) any other use will be in compliance with applicable law and with a licensed healthcare provider for its dispensing or administration to patients pursuant to a legitimate prescription. Customer will defend, indemnify and hold Seller harmless from any and all liability arising out of or due to non-adherence with such legal or regulatory requirements or the foregoing representation and warranty.

23.2. <u>FRAUD AND ABUSE LAWS</u>. CUSTOMER MAY RECEIVE DISCOUNTS OR OTHER REDUCTIONS IN PRICE IN CONNECTION WITH ITS PURCHASES OF PRODUCTS UNDER THESE TERMS OF SALE, AND SUCH PURCHASES MAY ALSO QUALIFY CUSTOMER FOR DISCOUNTS OR OTHER REDUCTIONS IN PRICE ON CERTAIN PURCHASES MADE PURSUANT TO A SUPPLY AGREEMENT BETWEEN CUSTOMER AND MCKESSON CORPORATION OR ITS SUBSIDIARY SUBJECT TO TERMS AND CONDITIONS THEREOF. CUSTOMER WILL BE RESPONSIBLE FOR REPORTING ALL PRICES, DISCOUNTS, AND REBATES PURSUANT TO THESE TERMS OF SALE AND PURSUANT TO ANY SUPPLY AGREEMENT BETWEEN CUSTOMER AND MCKESSON CORPORATION, TO REIMBURSING AGENCIES TO THE EXTENT REQUIRED BY LAW OR REGULATION, INCLUDING MEDICARE AND MEDICAID, AND OTHER ENTITIES, MAINTAINING RECORDS THEREOF, AND PROVIDING INFORMATION TO REIMBURSING AGENCIES, IN ACCORDANCE WITH ALL APPLICABLE LAWS. ANY PRICE REDUCTION OR DISCOUNT PROGRAM DESCRIBED IN THESE TERMS OF SALE OR ANY SUPPLY AGREEMENT BETWEEN CUSTOMER AND MCKESSON CORPORATION IS INTENDED TO BE A DISCOUNT WITHIN THE MEANING OF APPLICABLE FEDERAL AND STATE ANTI-KICKBACK LAWS, INCLUDING, 42 U.S.C. §1320A-7B(B) AND THE DISCOUNT SAFE HARBOR PROMULGATED THEREUNDER AND CURRENTLY FOUND AT 42 C.F.R. §1001.952(H). CUSTOMER UNDERSTANDS THAT THESE TERMS OF SALE AND ANY SUPPLY AGREEMENT BETWEEN CUSTOMER AND MCKESSON CORPORATION MAY NOT REFLECT THE NET COST OF A PRODUCT DUE TO A REBATE OR OTHER DISCOUNT PROGRAM.

CUSTOMER REPRESENTS AND WARRANTS THAT IT WILL SATISFY ANY AND ALL REQUIREMENTS IMPOSED ON BUYERS, INCLUDING WHEN REQUIRED BY LAW, THE REQUIREMENT TO ACCURATELY REPORT, OR MAKE AVAILABLE UPON REQUEST BY A FEDERAL OR STATE HEALTHCARE PROGRAM, THE NET COST ACTUALLY PAID BY CUSTOMER FOR THE PRODUCTS AND SERVICES COVERED BY THESE TERMS OF SALE AND ANY SUPPLY AGREEMENT BETWEEN CUSTOMER AND MCKESSON CORPORATION. FOR PURPOSES OF COST REPORTING REQUIREMENTS UNDER A FEDERAL OR STATE PROGRAM WHICH PROVIDES COST-BASED REIMBURSEMENT, CUSTOMER UNDERSTANDS THAT ANY SUCH DISCOUNTS, INCLUDING REBATES, SHOULD BE PROPERLY ALLOCATED ON A UNIT BASIS SO AS TO REPORT A NET SALE PRICE THAT ACCURATELY REFLECTS THE TOTAL AMOUNT OF THE DISCOUNT RECEIVED. IN THE EVENT EITHER PARTY DETERMINES THAT THESE TERMS OF SALE MAY NOT COMPLY WITH SUCH STATUTES, THE PARTIES AGREE TO WORK TOGETHER TO ESTABLISH A DISCOUNT OR REBATE STRUCTURE THAT MEETS THE REQUIREMENTS OF SUCH STATUTES.

23.3. <u>Controlled Substances and Other Regulations</u>. If performance of these Terms of Sale would cause Seller to be noncompliant with or in jeopardy of being noncompliant with any federal, state or local law, rule, regulation or ordinance or any governmental requirement, guideline or pronouncement involving either controlled pharmaceutical drugs ("**Controlled**


COPYRIGHT © 2025 MCKESSON MEDICAL-SURGICAL INC. ALL RIGHTS RESERVED.
THIS DOCUMENT IS PROPRIETARY AND YOU MAY NOT REVEAL THE CONTENTS.

**Substances**") or any other regulated products or activities, including but not limited to the Drug Enforcement Administration's regulatory requirements for verifying its customers and reporting suspicious or excessive orders, Seller may, in its sole and absolute discretion and, notwithstanding anything in these Terms of Sale to the contrary, without any penalty or liability, do any of the following: (a) limit or deny any order for Controlled Substances or other regulated products as warranted by any established diversion monitoring program of Seller and (b) immediately cease the sale of Product, in whole or in part, without liability if: (i) continued performance by Seller would violate any federal, state or local law, rule or regulation, or put Seller in jeopardy of violating any federal, state or local law, rule or regulation regarding either Controlled Substances or any other regulated products or activities; or (ii) Seller receives a complaint, notice, warning letter or other communication from a governmental agency alleging noncompliance with any laws, rules or regulations in relation to Seller's distribution of any Products (including without limitation Controlled Substances) under these Terms of Sale or to Seller's actions or omissions with respect to either Controlled Substances or any other regulated products or activities.

23.4. Own Use. Unless agreed to otherwise by the parties, all purchases under these Terms of Sale by Customer will be for Customer's "own use" as that term is defined in judicial or legislative interpretation. Customer shall not intentionally or knowingly participate in any Diversion of Products. "**Diversion**" shall mean: any resale of Products purchased hereunder by Customer, including, but not limited to, any resale or transfer of Products into the market by Customer; any resale or transfer of Products by Customer to subsidiaries or affiliates of Customer for resale; or any resale or transfer of Products by Customer to any unauthorized third party for any reason. Customer acknowledges that purchases of Products from Seller may be subject to pricing, distribution, provenance, identification, return and chargeback policies from the manufacturers of such Products and that Customer is required to comply with all such manufacturer's policies.

23.5. Excluded Provider. Neither Customer nor any of its affiliates, employees or contractors: (a) have been convicted of a criminal offense related to healthcare; (b) are listed on the Office of Inspector General's List of Excluded Individuals/Entities, or are otherwise currently excluded, suspended or debarred from participating in any federal healthcare program; (c) are under investigation (civil or criminal) by any federal or state enforcement, regulatory, administrative or licensing agency; or (d) are currently listed on the General Services Administration List of Parties Excluded from the Federal Procurement and Non-Procurement Programs.

23.6. Prop 65. Customer is deemed to have notice of all Product labels and labeling, including for purposes of California Code of Regulations, tit. 27, § 25600.2 (b), (c), and (e)(4), and waives any further notice. Customer will cause any end-user patients/consumers to receive notice of all Product labels and labeling.

**24. Governing Law**. These Terms of Sale will be governed by and construed in accordance with the laws of the Commonwealth of Virginia. Notwithstanding the foregoing, if any terms that are unique to federal government contracting are subject to interpretation, such terms shall be construed and interpreted according to the federal law of government contracts as enunciated and applied by federal statutes, regulations, federal judicial bodies, boards of contract appeals, and other judicial and quasi-judicial agencies of the government.

**25. Time for Bringing Action.** Any action of any kind arising out of or in any way connected with these Terms of Sale, other than collection of outstanding payment obligations, must be commenced within one (1) year upon which the cause of action accrued.

**26. Relationship of the Parties**. The parties hereto are independent contractors. Nothing in these Terms of Sale shall be deemed to create an agency, employment, partnership, fiduciary or joint venture between the parties. No party hereto (nor any agent or employee of that party) shall make any representations or warranties or incur any liability on behalf of the other.

**27. Assignment.** Customer shall not assign or transfer any interest under any order accepted by Seller or delegate any obligation hereunder without the prior written consent of Seller.

**28. Joint and Several Liability**. All obligations of Customer and any Facility that are purchasing or have purchased under a Customer account, regardless of the affiliation with Customer, will be joint and several. To the fullest extent permitted by law, Customer waives any and all suretyship defenses, which Customer might otherwise have with regard to obligations to pay for Products purchased by any Customer Facility. Without limiting the foregoing, such waiver includes a waiver of the defense that the original obligations were altered in any respect or the remedies or rights of Seller with respect to the original obligations were in any way impaired or suspended.

**29. WAIVER OF JURY TRIAL. THE PARTIES HERETO WAIVE ALL RIGHTS TO A JURY TRIAL IN ANY LITIGATION ARISING FROM OR RELATED IN ANY WAY TO THESE TERMS OF SALE, OR THE TRANSACTION CONTEMPLATED HEREBY.**

**30. Indemnification.** Customer will defend, indemnify, save and hold harmless Seller and its affiliates from any and all third-party claims, demands, liabilities, costs or expenses, including reasonable attorneys' fees, resulting from Customer's breach of this Agreement. Seller agrees to: (i) promptly notify Customer in writing of any claim; and (ii) give Customer the opportunity to defend or negotiate a settlement of any such claim at Customer's expense and cooperate with Customer, at Customer's expense, in defending or settling such claim. Seller reserves the right, at its own expense, to participate in the defense of any matter otherwise subject to indemnification by Customer which Customer is defending or settling. Seller reserves the right, at Customer's expense, to defend or settle any matter otherwise subject to indemnification by Customer which Customer is not defending or settling.

**31. Product Sales Prohibited**. Customer shall not engage in any resale of the Products, including in brick-and-mortar settings and online. This resale prohibition applies to all resale forums, including, but not limited to, brick-and-mortar settings, e-commerce platforms which are owned or operated by Customer, third-party marketplace websites (e.g., Amazon.com,


COPYRIGHT © 2025 MCKESSON MEDICAL-SURGICAL INC. ALL RIGHTS RESERVED.
THIS DOCUMENT IS PROPRIETARY AND YOU MAY NOT REVEAL THE CONTENTS.

Case: 4:26-cv-01526-JMB Doc. #: 1-1 Filed: 09/25/26 Page: 9 of 9 PageID #: 17

Walmart, eBay, Alibaba), drop-ship accounts (e.g., Buy.com, Newegg.com, Overstock.com, Groupon.com), classified sites (e.g., Craigslist.com, Facebook Marketplace), or direct messages on social media or online forums. If you are interested in reselling Products, including online, you must first receive Seller's prior written consent; reach out to your account representative for more information.

**32. Product Care, Customer Service, and Other Quality Controls for the McKesson Brand of Products**. Customer shall comply with the following product care, customer service, and other quality controls:

32.1. Customer shall comply with instructions provided by Seller regarding the storage, handling, shipping, disposal, or other aspect of the McKesson Brand Products, including instructions provided on McKesson Brand Products labels, as appropriate. Customer shall store McKesson Brand Products in a cool, dry place, away from direct sunlight until used.

32.2. Promptly upon receipt of the McKesson Brand Products, inspect the McKesson Brand Products and their packaging for damage, defect, broken seals, evidence of tampering, or other nonconformance. See the Return and Refund Policy above.

32.3. Customer shall be familiar with the special features of the McKesson Brand Products.

32.4. Customer shall: cooperate with Seller with respect to any McKesson Brand Products tracking systems that may be implemented from time to time; cooperate with respect to any McKesson Brand Products recall or other safety information dissemination effort; implement commercially reasonable loss prevention and anti-diversion measures, and promptly notify Seller in the event of a theft or other loss of a material quantity of McKesson Brand Products; and report to Seller any adverse claim regarding the McKesson Brand Products and assist Seller in investigating any such adverse claims.

32.5. License Grant. As it pertains to the McKesson Brand Products, Seller or its licensors hereby grants to Customer a limited, non-exclusive, non-transferable, royalty-free, revocable license to use certain photographs and product descriptions of McKesson Brand Products ("**Content**") solely for the purpose of using the McKesson Brand Products represented in the Content for its operations and to use such McKesson Brand Products with Customer's end user consumers through printed materials. Customer's use of the Content shall inure to the sole benefit of Seller. Nothing in these Terms of Sale shall be deemed to grant to Customer any ownership interests in the Content. If Customer acquires any rights in any Content by operation of law or otherwise, Customer will immediately, at no expense to Seller, assign such rights to Seller or to a third party designated by Seller along with any associated goodwill, applications and/or registrations. For Products other than the McKesson Brand Products, Seller hereby grants Customer permission to use the Content for purposes of using said Products in accordance with the terms of this Terms of Sale.

VERSION DATE: May 1, 2025


COPYRIGHT © 2025 MCKESSON MEDICAL-SURGICAL INC. ALL RIGHTS RESERVED.
THIS DOCUMENT IS PROPRIETARY AND YOU MAY NOT REVEAL THE CONTENTS.